FILED

2020 Sep-03  AM 09:11
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **TUNSTALL R. GRAY,** | ) | |
| | ) | |
| **PLAINTIFF,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | _____ |
| **HARTFORD LIFE & ACCIDENT** | ) | |
| **INSURANCE COMPANY,** | ) | |
| | ) | |
| **DEFENDANT.** | ) | |

## <u>COMPLAINT</u>

Plaintiff Tunstall R. Gray ("Plaintiff") brings this action for violations of the Employee Retirement Income Security Act of 1974 committed by Hartford Life & Accident Insurance Company ("Hartford") in connection with the provision of ERISA-governed disability benefits under a group insurance plan sponsored by Plaintiff's former employer, Children's of Alabama Charity Trust. In support of the relief requested herein, Plaintiff alleges the following upon personal knowledge as to himself and as to all other matters upon information and belief based upon, *inter alia*, the investigation made by and through his attorneys:

## INTRODUCTORY STATEMENT

1.    This is an action for legal and equitable relief seeking redress of violations of the Employee Retirement Income Security Act (hereinafter referred to as "ERISA").   This suit is brought pursuant to 29 U.S.C. § 1132(a) to secure disability benefits due to Plaintiff through the group insurance policies sponsored by Children's of Alabama Charity Trust.

2.    The Plaintiff seeks all benefits to which he may be entitled should this Court determine he is "disabled," including long-term disability and life-coverage-during-disability benefits under policies issued or administered and underwritten by Hartford.

3.    Plaintiff seeks such benefits together with any other disability-related benefits his plan may provide based on the conditions documented in his medical records and assessment information.   These conditions stem from his electrocution and fall through a ceiling at work on September 26, 2017. After achieving maximum recovery, Plaintiff continues to demonstrate pain and stiffness and has little range of motion in his left arm in particular, and to some degree also in his right arm.  He also has a partially amputated thumb and has significant impairments to his manual dexterity which have been confirmed through a Functional Capacity Examination, his physicians, and even by one of Hartford's own reviewers.

2

## JURISDICTION

4.      Jurisdiction is appropriate under 28 U.S.C. § 1331 in that 29 U.S.C. §1132(e) confers jurisdiction upon the district courts of the United States where, as here, Plaintiff's claims relate to an "employee welfare benefit plan" and/or an "employee pension plan" as those terms are defined within 29 U.S.C. § 1001, et. seq. The Plan "may be found" within this district.

5.      Jurisdiction is further appropriate under 28 U.S.C. § 1332 in that the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and diversity of citizenship exists between the parties.

6.      Venue is appropriate in this District Court pursuant to 29 U.S.C. § 1132(e)(2), in that the employee welfare benefit plan at issue was at least partly administered in this District and Defendant may be found or resides in this District.

## PARTIES

7.      Plaintiff Tunstall R. Gray is a participant in the Plans at issue and thus entitled to benefits available thereunder.

8.      Defendant Hartford is a foreign corporation that does business by agent or otherwise in all counties in Alabama.

9.      Hartford is a "fiduciary" of The Plans as that term is defined by 29 U.S.C. § 1002(21).

3

10.     One of Hartford's designated agent for service of process is:

CT Corporation System
2 North Jackson Street, Suite 605
Montgomery, AL 36104

11.     Hartford is an entity exercising authority or control respecting the management or disposition of Plans' assets or the personnel exercising said authority over Plan assets.

12.     Hartford is an entity providing services to The Plans at issue.

13.     Hartford is an entity meeting ERISA's definition of a "party in interest" in this case as that term is defined by 29 U.S.C. § 1002(14).

## THE PLAN

14.     The Children's of Alabama Charity Trust long-term disability plan and group life insurance plan are funded entirely by group long-term and life insurance policies sold by Hartford, the company which also underwrote these group policies.

15.     These group policies were purchased by Plaintiff's employer to confer certain benefits upon Plaintiff and other employees.

16.     As a result, these policies qualify as employee welfare benefit plans as defined in 29 U.S.C. § 1002(1), and Plaintiff qualifies as a participant and/or beneficiary under the Plans as that term is used in 29 U.S.C. § 1132.

4

17.    Under the terms of each of these Plans providing for certain benefits accruing upon the Plaintiff becoming disabled, Plaintiff is "disabled" as these Plans define that term.

18.    The LTD policy defines disability as follows:

**Disability or Disabled** means You are prevented from performing one or more of the Essential Duties of:

1) Your Occupation during the Elimination Period;

2) Your Occupation for the 24 months following the Elimination Period, and as a result Your Current Monthly Earnings are less than 80% of Your Indexed Pre-disability Earnings; and

3) after that, Any Occupation.

19.    The LTD policy defines "Any Occupation" to be "any occupation for which you are qualified by education, training or experience, and that has an earnings potential greater than the lesser of: (1) the product of Your Indexed Pre-disability Earnings and the Benefit Percentage; or (2) the Maximum Monthly Benefit."

20.    The Group Life policy defines disability to mean, "You are prevented by injury or sickness from doing any work for which You are, or could become, qualified by: 1) training; 2) education; or 3) experience." Qualification under this definition entitles the participant to continue his or her life insurance without obligation to pay the premium to continue the coverage after employment has ceased due to disability.

21.    There are no Plan documents indicating that Hartford has an enforceable grant of discretionary authority as Plan or Claims Administrator or that any express delegation has occurred for these Plans.  Such documents have been requested from the Plan Administrator and Hartford and no such document has been produced.

## HARTFORD'S LIABILITY

22.    Plaintiff worked as a staff engineer for Children's Hospital as a maintenance worker/building engineer, an occupation that involved servicing and maintaining commercial HVAC systems, including the chillers and boilers. It also involved light electrician work, making plumbing repairs, and performing general facility maintenance around the hospital.

23.    It was almost entirely a physical job with a lot of ladder climbing, reaching, or crawling. It did not involve computer usage, except that which was associated with the operation of the HVAC system or the use of hospital-provided iPads to enter the amount of time spent on a particular job.

24.    On September 26, 2017, Plaintiff suffered an electrocution and fall ten feet through a ceiling at work and onto a hard floor that affected his upper extremities and badly tore his rotator cuff in his left shoulder.  The electricity had entered his left side, caused multiple tears in that shoulder, then traveled through his body resulting in a burn on his left hand and an exit wound on his right hand.

25.   He underwent surgery for the multiple tears, but his recovery was limited, and he still lost a significant amount of function as a result.

26.   This accident left Plaintiff with significant pain and stiffness through his upper body.  He has little range of motion in his left arm in particular, and to some degree also in his right arm.

27.   Plaintiff also has a significant functional deficiency in his manual dexterity.  In addition to having a partially amputated thumb, he also has permanent nerve damage affecting his dexterity and grip strength, such that Plaintiff has difficulty with cutting up his food.  His wife does this for him.

28.   Plaintiff attempted to return to work in April 2018 in a reduced capacity, but the return was unsuccessful.

29.   After it became apparent that Plaintiff had lost the ability to continue working, Plaintiff submitted a claim with Hartford for benefits through Children's Hospital's group disability policy that it provided to him and other employees in this eventuality.

30.   In a letter dated April 22, 2019, the claims team assigned to Plaintiff indicated they found him to be disabled under the terms of the group LTD policy and therefore entitled to benefits commencing September 26, 2018 and continuing through the date of their approval.

31.   Hartford expressly based its approval at that time on the results from a

Functional Capacity Examination to which Plaintiff had submitted on July 12, 2018 and the records from Dr. Meyer, one of Plaintiff's attending physicians, who was selected by his employer and a worker's compensation insurance carrier.

32.     Upon approval, Hartford calculated Plaintiff's benefit to be far less than what should have been owed under the LTD policy at that time, citing Plaintiff's receipt of Worker's Compensation benefits attributable to his on-the-job injury which under the policy provided a dollar-for-dollar offset. Hartford, however, used an inflated number to calculate this offset, which resulted in Plaintiff being substantially underpaid at the commencement of his benefit.

33.     Plaintiff, through counsel, quickly informed Hartford that its benefit calculation was erroneous and requested a copy of Plaintiff's claim record and other "relevant" information defined as that term is defined under Department of Labor regulations relevant to ERISA benefit claims.

34.     Around this same time, Plaintiff received a letter from a different claims group within Hartford dated May 14, 2019 informing him that his claim for waiver-of-premium benefits for his Group Life insurance was denied.

35.     Upon receipt of this letter, Plaintiff, through counsel, requested a copy of that particular claim record as well.

36.     Plaintiff thereafter received a second letter from Hartford's LWOP claims team informing again in what appeared to be a new letter and new decision

8

that Plaintiff's LWOP benefit was, again, denied.  It appeared that Hartford had communication problems within its company and failed to properly document its claim record.

37.   With the benefit calculation issue still unresolved, in a letter dated August 8, 2019, Hartford's LTD claims team announced the initiation of a new review into Plaintiff's continuing disability and requested that Plaintiff provide updated information, including updated records.

38.   Meanwhile, a few days later on August 14, 2019, Plaintiff sent information about his worker's compensation benefit supporting his contention that Hartford had been substantially underpaying his disability benefit and formally appealing as to that issue.

39.   On August 27, 2019, Plaintiff responded to Hartford's request for updated information, indicating that his overall condition had somewhat worsened because of increased stiffness further impacting his mobility.

40.   In a letter dated September 5, 2019, Hartford's LWOP claims team informed again that Plaintiff's LWOP benefit was denied and invited an appeal on the same. The basis for that denial was the LWOP claims team's finding that Plaintiff did not meet the benefit's disability standard, which required Plaintiff to be "prevented by injury or sickness from performing any work for which You are, or could become, qualified by: (1) education; (2) training; or (3) experience."

41.   This standard was different from the standard applicable at the time for Plaintiff's LTD benefit, which required Plaintiff to be prevented from performing the essential duties of his "Own Occupation" as opposed to "any work."

42.   On September 10th, Plaintiff provided Hartford with additional worker's compensation information at Hartford's request and awaited Hartford's correction of that issue.

43.   On September 30, 2019, Plaintiff completed the rest of his response to Hartford's request for updated information by providing a physician assessment, which reported Plaintiff at that time to be unable to maintain a seated position for more than 4 hours per day during a typical work week; unable to stand or walk for more than one our per day; and unable to maneuver weight greater than around 5 pounds with any frequency.

44.   Plaintiff's pain, observed as "severe" was found to be substantiated, with attendant lapses in memory and concentration.

45.   The assessment concluded with the finding that Plaintiff would reasonably be expected to be unable to attend work fulltime and would have a reasonable need to be absent 5 or more days per month.

46.   On October 22, 2019, Plaintiff sent Hartford additional information responding to follow-up questions received since sending Hartford more worker's compensation information about that benefit and more medical evidence. In doing

so, Plaintiff confirmed there were no longer any outstanding matters and stated he would await hearing back from Hartford soon.

47.   At the end of October, Plaintiff formally appealed Hartford's LWOP determination as he had been invited to do, submitting the same information that had been sent to Hartford's LTD unit.

48.   Hartford acknowledged the appeal in its letter dated October 30, 2019 and suggested that its appeal review was underway.

49.   In a letter dated November 14, 2019, Hartford finally informed of its agreement that Plaintiff had been underpaid benefits because it had erroneously assumed the wrong worker's compensation amount for Plaintiff.   It found the underpayment to total $28,151.45 and sent a check for that amount.

50.   In that letter, Hartford also revised its information about the effective date of Plaintiff's claim, finding it to have actually begun as of December 27, 2019, after allowing for a correct elimination period and other adjustments.

51.   This recalibration of Hartford's data for when the claim began immediately triggered a new review for Plaintiff's continued eligibility for benefits beyond December 28, 2019 following his receipt of two years' worth of benefits. This review coincided with a change in the disability definition that occurred in the group LTD policy at that point, where the definition transitioned from one premised on the inability to perform one's "own occupation" to the inability to perform "any

11

occupation."

52.   Around that same time, Hartford's LWOP claims team sent a letter attaching a medical records review from Dr. Michael Aron and inviting Plaintiff to respond to it before it issued a decision on Plaintiff's LWOP appeal.

53.   A few weeks later on December 16, 2019, Hartford's LWOP claims team sent a letter indicating that there was now an "addendum" medical review and additional medical information.  The letter invited a response and indicated that a written decision would follow on or before January 26, 2020.

54.   In a letter dated December 27, 2019, Hartford's LTD claims team issued a decision informing of the termination and closure of Plaintiff's LTD claim effective December 28, 2019, based on a review of records by Dr. Michael Aron – the same medical records reviewer identified by the LWOP claims team --  who concluded "that there were no examination findings to support that [Mr. Gray is] incapable of performing full time work activities."

55.   A Hartford internal vocational employee resource then found based on Dr. Aron's review that Plaintiff was able to return to work as either a "Surveillance System Monitor", a "Charter", or a "Matrix Inspector" occupations which require dexterity with both hands.

56.   Hartford's claim team relied on these reviews for its ultimate determination that Plaintiff longer qualified for LTD benefits under the plan's "Any

12

Occupation" disability definition.

57.    Hartford's decision process, however, ignored entirely the Plaintiff's clear issues with manual dexterity, a problem which prevents Plaintiff from using a keyboard or performing any of the other data-entry functions of the occupations identified for him.  It did so even though Dr. Aron himself noted Plaintiff to be capable of only being "occasionally" able to engage in fine manipulation or execute simple and firm grasping with his left hand.  The opinion, though biased and reckless, did not support the ability to engage in full-time occupations.

58.    This December 27, 2019 letter did not reference the LWOP appeal or appear to render a decision on that benefit.

59.    Plaintiff appealed Hartford's LTD claim termination on May 21, 2020 via facsimile and U.S. certified mail.

60.    Plaintiff informed in that same letter that no decision on Plaintiff's LWOP appeal was ever received, notwithstanding Hartford's promise that one would be sent in late January, so Plaintiff informed the LTD appeal to also be a supplemental submission for Hartford's simultaneous and no-lengthy consideration of his LWOP appeal.

61.    The facsimile transmission confirmation shows Hartford received the appeal on the date it was sent, or May 21, 2020.

62.    Hartford's receipt of the mailed version of the appeal occurred on May

13

29, 2020 according to the returned receipt from the certified mailing.

63.    Plaintiff included an updated FCE result with his appeal that included testing designed to quantify Dr. Aron's finding and that of other medical professionals who had examined the Plaintiff that Plaintiff had impaired manual dexterity.

64.    This FCE testing showed Plaintiff to have impaired grip strength in his right hand and to be restricted from any task requiring equal contribution from each hand, which would include keyboarding skills.

65.    The FCE report also included the following finding: "The left hand is functioning as an 'assistor' to the right. Any task that requires equal contribution from each hand is restricted. Fine activities such as threading bolts, awkward positioning of hands while working (using hands without vision assist) are all significantly impaired."

66.    According to the independent vocational review Plaintiff obtained, this deficiency plus Plaintiff's other functional limitations, coupled with his past training, education and experience, rendered Plaintiff "100% vocationally disabled" from performing any occupation.

67.    Hartford confirmed receipt of the appeal in a letter dated May 26, 2020.

68.    In that same letter, Hartford also attached what it represented to be a decision letter on Plaintiff's LWOP appeal bearing the date January 9, 2020. This

was the first time Plaintiff had seen this attachment.

69.   Several days later on June 4, 2020, Hartford sent a letter to Plaintiff suggesting that it did not have all of the appeal package referenced in Plaintiff's appeal letter and suggesting that it intended to toll its time for deciding the appeal until this was rectified.

70.   However, on June 5, 2020, or the following day, Hartford conceded its error and commenced review of the appeal after realizing it had received the entire package through the copy of the appeal that had been sent via certified mail.  That copy included a CD with the supporting documentation referenced in Plaintiff's appeal letter.

71.   Thirteen days later on June 18, 2020, Hartford sent Plaintiff a copy of a medical records review from its vendor Exam Coordinators Network ("ECN") that this time arranged the review of records to be performed by Dr. Mahdy Flores, who purported to have certifications in family and occupational medicine.  (However, no CV for Dr. Flores was provided confirming this to be so.)

72.   The letter gave Plaintiff until July 9, 2020 to reply, with a decision then to be issued by July 26, 2020.

73.   Plaintiff, through counsel, provided his rebuttal to Dr. Flores's report on July 8, 2020, attaching a review by a physician who was Board Certified in Occupational Medicine.  This reply noted Dr. Flores's slapdash report where he

stated, falsely, that there was no evidence of functional impairment beyond December 28, 2019, a fact plainly contradicted by the presence of a January 28, 2020 FCE report that provided exactly that information. That statement indicated Dr. Flores did not do a thorough or meaningful review of the records he attested he had viewed.

74.   Dr. Flores's omission was especially problematic because it did not consider or address the FCE's findings as to Plaintiff's lack of manual strength or dexterity which prevented him from being able even to use a keyboard in a functional way.

75.   Plaintiff's reply also noted the absurdity of Dr. Flores's cavalier conclusion that Plaintiff's conditions, shown to be permanent, somehow miraculously abated *completely* as of December 28, 2019.   Plaintiff, and the reviewing doctor whose report was attached, noted there were no records at all that supported Dr. Flores's finding that Plaintiff's muscle and nerve damage, and amputation sustained in his accident had spontaneously repaired.

76.   Instead of undertaking a meaningful consideration into whether Dr. Flores's report was entitled to weight in light of its issues, Hartford sought to fix it, and in doing so, illegally elongated its administration of the claim beyond the time permitted by the Plan and Department of Labor regulations for issuing a claim decision.

77. On July 16, 2020, or fifty-one days after Hartford received Plaintiff's appeal, Hartford's appeals handler sent Plaintiff a letter indicating that no decision was forthcoming, and that Hartford was continuing its review by giving Dr. Flores the opportunity for a do-over with his report. This letter provided that do-over attempt to Plaintiff and again invited a response, even though at this point any written decision issued by Hartford was out-of-time.

78. Dr. Flores's second attempt at a serviceable report for Hartford was even worse than the first. Evidently taking to heart the earlier criticism that he had not identified any records to support his conclusion that Plaintiff had overcome his nerve and muscle damage by December 2019, Dr. Flores unearthed an examination record dated December 9, 2019, where a nurse practitioner did not note any such problems with Plaintiff.

79. In pulling this record, Dr. Flores failed to note that the reason for the appointment with the nurse practitioner was to seek treatment for erectile dysfunction and hypertension, which had nothing to do with Plaintiff's reasons for not being able to work. As with the FCE before, Dr. Flores appeared to be simply looking for ways continue supporting Hartford's planned denial of the appeal.

80. Plaintiff sent a letter to Hartford on August 5, 2020 again noting the ridiculousness of Dr. Flores's work-product on Hartford's behalf and noted it to be even more unreliable at that point than it had been when it was originally undertaken

several weeks earlier.

81.    In a letter dated August 11, 2020, Hartford sought to avail itself of an extension for the first time, notwithstanding the fact that 77 days had now passed since first receiving Plaintiff's appeal. It gave no reason for seeking this untimely extension other than the fact that it did not feel comfortable making a decision based on Dr. Flores's two efforts at issuing a report.

82.    On August 13, 2020, either Hartford, ECN or Dr. Flores's office attempted that day to contact the reviewer Plaintiff had retained to provide a review of Dr. Flores's review work.  The caller, however, abruptly aborted the call when the reviewer indicated that he was not a treating physician for the Plaintiff, but an independent reviewer and examiner.

83.    Plaintiff, through counsel, informed Hartford that its delay in deciding the claim within the time permitted under Plan terms and Department of Labor regulations meant that it was denied by operation of law and that the administrative process was at an end.

84.    Hartford, however, continued its out-of-time review of the claim and sent it back to Dr. Flores for a third attempt at a defensible report. It provided this third attempt to Plaintiff, through counsel, on August 21, 2020.

85.    In this third effort, Dr. Flores again walked back the prior version of what he did. In addition to abandoning his reliance on an erectile dysfunction

18

appointment as being evidence that Plaintiff's muscle and nerve damage had healed, he finally agreed this time at the very least that Plaintiff had a number of confirmed functional limitations after all that were documented in his January 2020 FCE and treatment records.

86.   But yet again Dr. Flores ignored and did not review or opine on Plaintiff's impairments affecting his hands.  As to that impairment, the January 2020 FCE continued to stand alone and be undisputed and uncontradicted.

87.   As of the date of the filing of this Complaint, it has been 96 days since Plaintiff lodged his appeal, and no written decision has issued.

88.   Plaintiff's appeal is therefore deemed exhausted by operation of law under Plan terms and Department of Labor regulations, entitling him to seek judicial review and entitling him to a *de novo* review on his claim for benefits because there is no timely written decision to which the Court may defer.

89.   In addition to failing to provide a timely written appeal decision, Hartford is guilty of the following during Plaintiff's claim process:

(a)   Failing to maintain adequate claims procedures, or any procedures *at all*, in compliance with Department of Labor regulations;

(b)   Targeting of Plaintiff's claims for denial because ERISA governs;

19

(c)     Failing to take any meaningful measures to insulate its claims process from its inherent conflict under the Supreme Court case *Glenn v. MetLife* and instead allowing its profit motive to influence its claims administration for Plaintiff;

(d)     The withholding of relevant documents and information from Plaintiff throughout the claims process and depriving Plaintiff of the ability to obtain a full and fair review of her claim;

(e)     Taking an adversarial posture against Plaintiff instead of a fiduciary posture by searching for ways to avoid paying part or all his claim;

(f)     Failing to conduct an adequate investigation, and not considering and/or according proper weight to relevant, supportive information;

(g)     Failing to accord any weight to Plaintiff's medical providers and other examiners who personally examined the Plaintiff, some on a regular basis, and at least one of which was selected by the employer and worker's compensation insurance carrier rather than the Plaintiff;

    (h)    Failing to adhere to the terms of the Plan, including as to the timely acceptance and processing of a claim for benefits and ensuing appeals;

    (i)    Purposefully limiting and curtailing the review of its medical personnel and otherwise improperly exerting influence on them to opine against payment of benefits;

    (j)    Unreasonably and arbitrarily overruling the professionals who personally examined Plaintiff and instead relying on the demonstrably deficient report of a biased and unqualified doctor to perform an incomplete review of medical records that had to be revisited twice; and

    (k)    Failing to give Plaintiff's claim a full co-morbid review and give any consideration to how his conditions impacted one another.

90.   Despite Plaintiff's established disability and entitlement to coverage under the terms of the LTD and Group Life plans, Hartford has failed to determine that he was still "disabled" and refused to find him qualified for disability benefits under each.

91.   As set forth above in connection with Hartford's fiduciary breaches, Hartford's claim decision was the product of a conflict of interest whereby it allowed its own financial interests to supersede its fiduciary obligations. Under

*Glenn*, this presents an additional reason for application of a *de novo* standard to their claim decision.

92.    This conflict of interest further calls into question the credibility of Hartford's claims personnel and reviewers.

93.    Hartford considered the applicability of ERISA before making its decision to deny Plaintiff's claim at the initial level and again at the appeal level. This presents an additional reason for application of a *de novo* standard to their claim decision.

94.    Hartford's decision process did not comport with 29 U.S.C. § 1133's requirement that any notice of the denial must contain the specific reasons for such denial, written in a manner calculated to be understood by the participant, and must comport with Department of Labor regulations. In fact, Hartford did not issue any written decision *at all* on Plaintiff's appeal within the time required under the Plan and relevant regulations.

95.    Plaintiff has exhausted all Plan remedies even though Hartford's failure to adhere to Plan terms or ERISA requirements and regulations did not require it. As such, this case is ripe for judicial review.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Tunstall R. Gray respectfully requests this court find jurisdiction and venue appropriate, and after trial, grant the following relief:

a.    For an order awarding Plaintiff all benefits due and owing in accordance with the terms of the Plans and Policies identified in this Complaint, as well as all prejudgment interest due thereon as permitted by law and equitable principles, pursuant to 29 U.S.C. § 1132(a);

b.    For a judgment against the Defendant awarding Plaintiff all costs and reasonable attorney's fees incurred connected to the prosecution of and pursuit of relief in this action as permitted under 29 U.S.C. § 1132(g)(1);

c.    For an order requiring Defendant to provide Plaintiff with any additional benefits to which the Plaintiff would be entitled pursuant to a finding that the Plaintiff is disabled under The Plan(s); and

d.    Such other relief as may be deemed just and proper.


Respectfully submitted,

M. Clayborn Williams (ASB-9101-A43M)

David P. Martin (ASB-3500-M68D)
**The Martin Law Group, LLC**
**Attorneys for Plaintiff**
P.O. Box 20087
Tuscaloosa, AL 35402
Phone (205) 343-1771
Facsimile (205) 343-1781
clay@erisacase.com
david@erisacase.com

23

**Plaintiff's Address:**

Tunstall R. Gray
c/o The Martin Law Group, LLC
P.O. Box 20087
Tuscaloosa, AL 35402

**Defendant's Address:**

Hartford Life & Accident Insurance Company
c/o CT Corporation System
2 North Jackson Street, Suite 605
Montgomery, AL 36104